THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HOMER J. McCALL, Defendant-Appellant.

Third District    No. 76-546

Opinion filed September 16, 1977.

Robert Agostinelli and Larry Mackey, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (James E. Hinterlong, of Illinois State's Attorneys Association, of counsel), for the People.

PER CURIAM:

Defendant Homer McCall appeals from a judgment and sentence of the Circuit Court of Peoria County following a bench trial, in which he was found guilty of pandering and sentenced to a term of not less than 1 nor more than 3 years imprisonment, with the sentence to run consecutively to an outstanding Federal sentence. The conviction of defendant was under section 11—16 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 11—16) (with applicable Committee Comments), which reads as follows:

"11—16. Pandering. (a) Any person who performs any of the following acts for money commits pandering:

(1) Compels a female to become a prostitute; or

(2) Arranges or offers to arrange a situation in which a female may practice prostitution.

(b) Sentence.

Pandering by compulsion is a Class 4 felony. Pandering other than by compulsion is a Class 4 felony." Ill. Rev. Stat. 1975, ch. 38, par. 11—16.

"Committee Comments
Revised by Charles H. Bowman

In reshaping the cluster of statutes formerly dealing with prostitution, some arbitrary distinctions in terminology were made. 'Pander', 'procure', and 'pimp' are three commonly used terms which have been employed to describe various types of activities connected with prostitution. An effort has been made here to use only one term to describe one general kind of function. Thus, pander has been used to denominate the activities of one who recruits prostitutes; pimp has been used as the label for one who lives off the earnings of the prostitute; procure is not used at all. So far as dictionary accuracy goes, the use of the words could be reversed. The distinctions were made here to provide

convenient references by giving a more specific functional meaning to the terms. Comparisons with statutory provisions of other states becomes unprofitable too, since there is no consistent pattern that is of much assistance.

Section 11—16 describes the activity here labeled 'pandering,' which involves the recruiting of persons into the practice of prostitution and with keeping practicing prostitutes in that line of endeavor. This functional classification then makes a distinction between the 'recruiter-business manager' and the runner or contact man (dealt with under the preceding section) and the individual who is the prostitute's consort—the pimp. Formerly, there were two principal statutes in the Illinois Criminal Code which dealt with the activity defined here as pandering.

\* \* \*

Pandering is described in the section in the alternative. Subsection (a)(2) requires only that the accused arrange or offer to arrange for another to become a prostitute. Whether she does or not is immaterial. It may appear overly stringent now to make a mere verbal solicitation a felony—particularly in view of the concern of the statute (Ill. Rev. Stat. 1961, ch. 38, §§165 to 169) for the heinousness of the technique used to place the female in the trade. However, once the historical reasons for this concern are dispensed with, the question resolves into one of whether pandering (as used in this section) should focus on the *solicitation* or the *success* of solicitation. Since it is the recruiting and management activity, and not its success, which is the evil, the section is aimed at this activity." Ill. Ann. Stat., ch. 38, par. 11—16, Committee Comments, at 464-66 (Smith-Hurd 1972).

It is noted that the Committee Comments point out that verbal solicitation would normally be expected to occur in pandering cases and that the focus here is not on success of the solicitation but rather the solicitation itself. It is also noted that the Comments emphasize that it is not only the recruiting of prostitutes but, also, keeping practicing prostitutes in that line of endeavor which would be involved in pandering.

From the record it was shown that the State offered three witnesses in support of the prosecution charge. The first witness was Elizabeth Ruggles, a policewoman working for the Peoria Police Department. Officer Ruggles was told to interview two females named Laura Goettsch and Julie Freyer, which she did. She advised an officer of the vice and drug unit of her conversation with the two girls. The officer instructed Ruggles to change into civilian clothing. The officer arranged to rent adjoining rooms at the Imperial 400 Motel in Peoria and he told Ruggles

to take the two girls to one of the two rooms while the officers from the vice and drug unit would take the adjoining room.

Ruggles arrived at the motel while the girls waited in the car and she registered for a room. She was instructed to attempt to contact the defendant McCall. After Laura and Julie came to the room, Laura began calling various bars in town asking for defendant. When she had no luck, she began calling the "McCalls" listed in the phone book. She finally reached defendant at his brother's residence and she asked him to come to their motel room and told him that she, Laura, and Julie had met a "girl" in the area of the Big 500 and that they were at her motel room. Defendant came to the motel and honked his horn. Laura went to the door and waved for him to come up to the motel room.

Laura answered the door when defendant knocked and after his entry defendant asked Laura and Julie if they were going to "go out and work." Laura told defendant that they had met Ruggles in the area of the Big 500 and that she told them it was too early to "turn any tricks" and told them they should come back to her room at the motel. The pertinent testimony given by Ruggles in her direct examination was as follows:

"A. Yes, Mr. McCall again asked the girls if they were going out to work. He said he needed the money. The girls stated no, that I had worked for a man who had just got busted and that I would be better at it than they would. I then told Mr. McCall that I had worked for a man who had been busted about a week before and since he had been busted I had been getting a lot of hassle from the other girls and the pimps in that area because I wasn't working for anybody and I was afraid if I worked for a local that I would be in trouble when he got out of jail.

Q. Was there any further conversation?

A. Yes. Again Mr. McCall asked the girls, he said he needed the money and wanted to know if they were going out and work. I said that they didn't appear to want to so let us talk and he said okey [sic]. I asked him just where I stood at this point. He said you stand on even street. I asked him what area or where exactly did he want us to work and did he want us to walk or work out of a bar and he said I want you to walk, you make more money. I asked him what area did he want me to work and he said the area of the Eldorado. I said what's the price. Laura ask [sic] him, she said, how much money and he said $35. He said no 5's, 10's, 20's, nothing less than $35 or you're giving it away. I told him at this time there was a lot of heat in that area, what happened if I am busted? He said he would bail me out if I got busted.

Q. Was there any further conversation?

A. Yes, at this time I started to repeat pretty much what he had

told me, that I would work in that area of the Eldorado, no less than $35, and I asked him what the cut would be and he said half and half for now baby.

Q. Was there any further conversation?

A. He just told me when I asked him what about all the heat that was going on in the area of the Eldorado, in that area. He stated the copys (sic) gave me a hassle, just to tell them I was Homer's woman and they would leave me alone.

Q. What happened next?

A. At that point I believe Mr. McCall started to leave and I gave a prearranged signal, at which time the officers in the adjoining room came in."

Ruggles admitted that, after her conversation with Laura and Julie at the police station, a decision had been made within the police staff to go out and make a pandering case against defendant. She stated that while she initiated the conversation with defendant, his discussion as to prostitution was specific in nature, as related in her testimony. Laura, who had been brought from Iowa, corroborated the testimony of Ruggles. She also indicated that the purpose of the call to defendant was to give him the impression that Ruggles was a prostitute looking for a pimp.

Defendant testified in his own behalf and stated that Ruggles had initiated the conversation with him and began telling him about her husband or pimp and that she was trying to get some money to get him out. He stated she asked him how much a person would charge to "turn a trick," and that he had answered that he wouldn't do it for less than $35 if he were a prostitute. He also stated that Ruggles asked, on her own initiative, what she would charge to work the street and whether he would take half of what she made. He stated that he expressed no interest in her suggestion and began to leave when he was arrested. He denied that he asked Ruggles, or anyone else in the room, to engage in prostitution for him. He also denied that he offered to arrange a situation where they could work as prostitutes. He admitted on cross-examination that he had brought Laura and Julie to Peoria with him from Iowa and that they had stayed at the Imperial 400 Motel the first night. He admitted that he had dropped Laura and Julie at a Peoria tavern and had given them money the night before and also stated that he had agreed to take them back to Clinton, Iowa.

On appeal in this court, defendant contends that he was not proven guilty of pandering because the evidence did not show that he made any offer of any arrangement whereby the undercover police woman, who was posing as a practicing prostitute, might have been able to continue in her pretended profession. He contends such proof was not made beyond a reasonable doubt.

The trial court could clearly find, on the basis of the record, that defendant was engaged in a conversation in response to Ruggles representation, that he was arranging a situation that would permit Ruggles to continue in the practice of prostitution. He had indicated he had some relationship of this character with Laura and Julie when he asked them both if they would go out on the street because he needed money. In the course of the conversation, defendant suggested the fee to be charged for prostitution services and also stated that he would bail Ruggles out, if she was arrested. He also told Ruggles that she should simply tell the police that she was "Homer's girl" and that the police would leave her alone. He told her she should work the street because she could make more money than she would if she worked a bar. The trial court therefore could find that the conduct of the defendant amounted to his attempting to have a prostitute work for him and of trying to keep her in that business.

In *People v. Houston* (1st Dist. 1976), 43 Ill. App. 3d 677, 357 N.E.2d 184, a case similar to the instant case, the defendants there had agreed to establish a police officer in business as a prostitute in exchange for which the female officer was to agree to turn over to them a portion of her earnings. The court in that case, relying on the Committee Comments to which we have referred, noted that the prohibited activity was recruiting and management activity such as keeping a practicing prostitute in that business. In the *Houston* case, the court distinguished *People v. Sangster* (4th Dist. 1970), 128 Ill. App. 2d 305, 261 N.E.2d 738, upon which defendant relies, by noting that the evidence of the exchange of money was needed in *Sangster* to show the relationship of the parties. Under the facts in *Houston*, however, and as would be true in the instant case, it is not necessary to show exchange of money to establish the nature of the transaction. In the instant case, defendant contended that he wanted no money and that Ruggles insisted that he take 50% of the proceeds of prostitution. The court could reasonably reject such testimony in light of the testimony of Ruggles and Laura as to the nature of the conversation and by reference to the record. Essentially, the trial court, on the record, could properly find that defendant was proven guilty of pandering by his agreement with Ruggles, where he told her he would furnish protection and bail in exchange for 50% of the proceeds of her prostitution activity.

Defendant recognizes in his brief that he could not raise the defense of entrapment since it is not available to an accused who, like defendant, denied having committed or participated in an unlawful act, under the precedent of *People v. Morgan* (1st Dist. 1968), 98 Ill. App. 2d 435, 240 N.E.2d 286. In that case the evidence was deemed sufficient to sustain a conviction for the offense of soliciting a prostitute where the law officer

merely provided an opportunity for the commission of the crime by a person who was already so disposed. While defendant did not raise the defense of entrapment, in his reply brief he seeks to raise a related defense and cites as his authority *People v. Housby* (3d Dist. 1975), 33 Ill. App. 3d 762, 338 N.E.2d 461. The *Housby* case was one involving a controlled substance where the defense of entrapment had been raised and where the State failed to rebut the defense of entrapment beyond a reasonable doubt. We pointed out in that case that where the intent to perform the criminal act arises in the minds of the law enforcement officer or his agent, and he induces an innocent man to do an act, in absence of rebutting testimony, there is entrapment. Defendant seeks to argue on appeal in this court, even though the defense was not previously raised and was raised for the first time in his reply brief, that the conviction of defendant here could not stand because in this case the government supplied Officer Ruggles, who was the presumed prostitute, and that the conviction therefore could not stand if the opportunity was presented by the law officers.

■■ ■ Defendant misconceives the force and effect of the *Housby* case. In that case we emphasized that the defendant was innocent and had no predisposition to sell drugs so far as the record disclosed and that, therefore, the defense of entrapment was available and allowed in that case. As stated in *People v. Morgan* (1st Dist. 1968), 98 Ill. App. 2d 435, 438-39, 240 N.E.2d 286;

> "As to the defense of entrapment, there is no entrapment where the law enforcement officer merely provides an opportunity for the commission of a crime by one who is already so disposed. 'The distinction that must be drawn is between the inducement of an otherwise innocent person and the apprehension through lawful artifice of an individual already engaged in criminal activity.' "

Clearly in the instant case and in the many cases involving purchase of controlled substances by an officer from a defendant or stolen articles, where the officer poses as a "fence," such convictions obviously can stand.

■■ Since the defense of entrapment was not raised by defendant in the trial court, or, properly, even in this court, that defense is not available on appeal. (*People v. Morgan* (1st Dist. 1968), 98 Ill. 2d 435, 439, 240 N.E.2d 286). As noted, there is also no support in the *Housby* precedent for the contention referred to herein that the defendant's conviction could not stand.

For the reasons stated, therefore, the judgment and sentence of the Circuit Court of Peoria County are affirmed.

Affirmed.